**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Patricia O'Keefe and Brandon Siguenza,<br><br>Plaintiffs,<br>v.<br><br>United States of America,<br><br>Defendant. | Case No. ____________________<br><br><br>**COMPLAINT** |

Plaintiffs Patricia O'Keefe and Brandon Siguenza, by their attorneys, bring this complaint against the United States of America pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §1346(b) and 28 U.S.C. Chapter 171.

## INTRODUCTION

1. During Operation Metro Surge, United States federal immigration officers unlawfully assaulted, battered, and falsely imprisoned Patricia O'Keefe and Brandon Siguenza and damaged Ms. O'Keefe's personal vehicle. The federal officers took these unlawful actions in retaliation for citizens exercising their First Amendment right to observe. The federal officers plainly felt they would not be held accountable for their violent and unlawful actions by their employer – the federal government. The federal officers abused their power to cause significant physical and mental harm to Ms. O'Keefe and Mr. Siguenza. The Federal Tort Claims Act gives Ms. O'Keefe and Mr. Siguenza the right to compensation for the harm they suffered at the hands of their government.

2. During Operation Metro Surge, thousands of federal immigration agents descended on Minnesota to create havoc, harass and destroy immigrant communities, and deliberately escalate encounters with the population to sow fear and inflict pain on the residents of Minnesota. In response, tens of thousands of Minnesotans courageously exercised their constitutional rights to protest and observe the actions of these federal agents.

3. Federal agents repeatedly attacked and even killed some observers and protestors. Others, including Ms. O'Keefe and Mr. Siguenza, were subjected to assault, battery, and false imprisonment.

4. On January 11, 2026, Ms. O'Keefe and Mr. Siguenza were observing ICE agents in Minneapolis. When the agents saw Ms. O'Keefe and Mr. Siguenza, they pepper sprayed Ms. O'Keefe's car, broke her car windows, pulled her and Mr. Siguenza out of the car, and arrested them with no lawful authority.

5. Ms. O'Keefe and Mr. Siguenza were detained at the Whipple building for over 8 hours.

6. The federal agents had no legal authority to treat Ms. O'Keefe and Mr. Siguenza as they did. The federal agents disregarded the United States' own policies regarding their arrest power, the treatment of protesters, and the use of force, among others.

## PARTIES

7. Plaintiff Patricia O'Keefe is a 36-year-old woman and regional director of a non-profit, a United States citizen, and a resident of Minneapolis.

8. Plaintiff Brandon Siguenza is a 32-year-old special ed teacher, a United States citizen, and a resident of Minneapolis.

9. The United States of America is the proper defendant to answer for the acts of "federal agencies" and their employees, officers, and agents. Such agencies include, without limitation, the U.S. Department of Homeland Security, its component agencies, such as the U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection.

10. At all relevant times, upon information and belief, the agents were deployed for Operation Metro Surge, were using federal vehicles and equipment, were wearing federally supplied tactical gear, used federal facilities, including the Whipple Federal Building.

11. At all relevant times, federal officers referenced in this Complaint were employees of the United States, working within the scope and course of their employment in these federal agencies.

12. At all relevant times, the federal officers referenced in this complaint were "investigative or law enforcement officers" within the definition of 28 U.S.C. § 2680(h).

## JURISDICTION AND VENUE

13. This Court has jurisdiction over Ms. O'Keefe and Mr. Siguenza's claims under the Federal Tort Claims Act, 28 U.S.C. § 1346(b).

14. Ms. O'Keefe and Mr. Siguenza have exhausted all available administrative remedies pursuant to 28 U.S.C. § 2675.

15. Ms. O'Keefe filed an administrative complaint with the United States Department of Homeland Security, US Customs and Border Protection, and US Immigration and Customs Enforcement on or about April 1, 2026 under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 et seq., seeking redress for the violations of her rights and damages proximately resulting from them.

16. Ms. O'Keefe's claims were denied in a letter dated August 26, 2026 and postmarked August 27, 2026 from Esther Cochran, Counsel for the District Court Litigation Division of ICE.

17. Mr. Siguenza filed an administrative complaint with the United States Department of Homeland Security, US Customs and Border Protection, and US Immigration and Customs Enforcement on or about August 3, 2026 under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 et seq., seeking redress for the violations of his rights and damages proximately resulting from them.

18. Mr. Siguenza's claims were denied in a letter dated August 19, 2026 and postmarked August 20, 2026 from Esther Cochran, Counsel for the District Court Litigation Division of ICE.

19. Pursuant to 28 U.S.C. § 1391 and 28 U.S.C. § 1402(b), venue is proper because Plaintiffs reside in Minnesota, and Defendant is the United States.

## FACTS

20. Patricia O'Keefe is a regional director of a national renewable energy non-profit. During Operation Metro Surge, she was appalled by the acts of violence used by ICE agents in our streets. She decided to observe ICE to protect her immigrant neighbors.

21. Brandon Siguenza is a middle school special education teacher in Richfield. He was horrified by the actions of federal agents in Minnesota. He knows that immigrants belong in Minnesota and felt that he had to help them by observing ICE actions.

22. On January 11, 2026, Ms. O'Keefe and Mr. Siguenza were observing ICE agents. They were riding in Ms. O'Keefe's car.

23. Ms. O'Keefe and Mr. Siguenza heard that ICE agents were attacking another observer near 42nd St and 16th Ave in South Minneapolis, near a local church.

24. Ms. O'Keefe and Mr. Siguenza drove to the scene.

25. When Ms. O'Keefe and Mr. Siguenza arrived, they saw what they assumed were ICE agents driving away in their cars. Ms. O'Keefe and Mr. Siguenza followed the vehicles at a safe distance.

26. After traveling approximately one block, one vehicle containing federal agents stopped in front of Ms. O'Keefe's car, and another vehicle containing federal agents pulled alongside Ms. O'Keefe's car. All of the agents were wearing what looked like body armor and wore masks that concealed their identities from observers and the public.

27. Two agents immediately approached the driver and passenger side windows of Ms. O'Keefe's vehicle.

28. One agent, wearing what appeared to be a Minnesota Timberwolves hat, came to Ms. O'Keefe's window.

29. Upon information and belief, that agent's name is Martin Lagunas (hereinafter "Agent Lagunas"). Agent Lagunas was reported to have earlier pointed his gun at other Minnesota observers and had posted "FAFO" (commonly used as an acronym for "Fuck Around and Find Out") on his personal Facebook account in response to a story about the killing of Renee Nicole Good by an ICE Agent.[1]

30. Upon information and belief, Agent Lagunas appears in the image below:




---

[1] Pablo Manriquez, *EXCLUSIVE: Two DHS Sources Confirm to Migrant Insider — The ICE Agent Who Pointed His Gun at a U.S. Citizen in Virginia Is Martin Lagunas*, Migrant Insider (Aug. 14, 2026), https://migrantinsider.com/p/exclusive-two-dhs-sources-confirm; Steve Held, Dave Byrnes & Raven Geary, *Chicago ICE team seen threatening drivers has roamed from Illinois to Minnesota to Virginia*, Unraveled Press (Aug. 14, 2026), https://unraveledpress.com/chicago-ice-team-seen-threatening-drivers-has-roamed-from-illinois-to-minnesota-to-virginia/

31. The other agent who approached, wearing a stocking cap and with visible facial hair, came to the passenger's side of Ms. O'Keefe's vehicle. Upon information and belief, that agent's name is Jack Ravencamp (hereinafter "Agent Ravencamp"). Agent Ravencamp is a defendant in a lawsuit filed in the United States District Court for the District of Maine which alleges that Agent Ravencamp used excessive and unlawful force,[2] similar to the actions the agents committed against Ms. O'Keefe and Mr. Siguenza.

32. Upon information and belief, Agent Ravencamp appears in the image below:



33. Agent Lagunas told Ms. O'Keefe, "This is your warning." It was unclear to Ms. O'Keefe what Agent Lagunas was warning them about. Ms. O'Keefe told the agents that she was not impeding them, and they were free to move along.

34. It appeared that the agents were also using their personal phones to record the encounter. The agent believed to be Agent Ravencamp hit the passenger window of

[2] *Carvajal-Muñoz v. Jack Corey Ravencamp et al.*, No. 2:26-cv-00190-JCN (D. Me.); Eric Adler, ICE agent from Johnson County accused of excessive force, sued in federal court, KANSAS CITY STAR (July 16, 2026), https://www.kansascity.com/news/local/article316522280.html.

Ms. O'Keefe's car to have Mr. Siguenza turn toward him and appeared to take a picture or video of Mr. Siguenza, as reflected below:



35. While the recording was happening, Ms. O'Keefe told the agents that she and Mr. Siguenza were not obstructing the agents, telling them that they could move forward.

36. As the agents had stopped in the middle of a street and made a significant commotion, several bystanders took notice of the events and began filming the agents and their actions.

37. After taking pictures of Ms. O'Keefe and Mr. Siguenza, the agents moved back to their car, as reflected below:



38. However, Agent Lagunas decided to escalate the situation. Agent Lagunas appeared to indicate to another car of agents that they could drive away. Then, Agent Lagunas grabbed a can of pepper spray and walked back toward Ms. O'Keefe and Mr. Siguenza, as the other agents slowly got in their vehicle.

39. The following image reflects Agent Lagunas holding a can of pepper spray and approaching Ms. O'Keefe and Mr. Siguenza:




40. Agent Lagunas looked at Ms. O'Keefe and gave her a thumb's up gesture, as reflected in the following image.



41. Ms. O'Keefe told Agent Lagunas that she and Mr. Siguenza were not obstructing them and told them to get out of Minnesota. Agent Lagunas started to walk away but then suddenly turned and returned to Ms. O'Keefe and Mr. Siguenza.

42. Without warning and without giving Ms. O'Keefe and Mr. Siguenza any orders or commands, Agent Lagunas sprayed a continuous stream of pepper spray into the air vents of Ms. O'Keefe's car.



43. The use of pepper spray in this manner was unjustified and unlawful, and caused damage to Ms. O'Keefe's vehicle's ventilation system and interior passenger compartment. The ventilation system of Ms. O'Keefe's vehicle still cannot be used without causing residue from the pepper spray to be distributed into the passenger compartment of the vehicle. Upon information and belief, cleaning the car would cost over $1000. Ms. O'Keefe has already spent $930 to clean her car, but it will need additional cleaning to completely remove the pepper spray residue and restore the vehicle to its prior condition.

44. Agent Lagunas then walked back to his vehicle, which started to drive away.

45. Ms. O'Keefe resumed following the ICE agents at a safe distance. The agents then immediately stopped their car and surrounded Ms. O'Keefe and Mr. Siguenza in their vehicle.

46. Agent Ravencamp again went to the passenger side of Ms. O'Keefe's vehicle, while two other agents, including Agent Lagunas, came to the driver's side window.

47. Another agent, wearing a New York Yankees hat (hereinafter "Agent 3"), was also recording the encounter on a cell phone. An image of Agent 3 is reflected below:



48. At this point, two agents moved to the passenger window of Ms. O'Keefe's vehicle. One of the agents signaled to the driver of the agents' SUV to reverse and bring the SUV closer to Ms. O'Keefe's car. In response, the driver of the agents' SUV moved the SUV from about five car lengths away to less than one car length away.

49. Once the Agents' vehicle was parked, the agents attacked Ms. O'Keefe and Mr. Siguenza.

50. With no legal justification, no legal warning, and no legal order, the agents broke the windows of Ms. O'Keefe's car and pulled Ms. O'Keefe and Mr. Siguenza out of the car.

51. Shards of broken glass flew into the car, covering both Ms. O'Keefe and Mr. Siguenza.

52. Agent Ravencamp attempted several times to pull Mr. Siguenza out of the car with brute strength, even though Mr. Siguenza was wearing a seatbelt. Neither Ms. O'Keefe nor Mr. Siguenza felt that it would be safe to put their hands down to unbuckle their seat belts. Eventually, the agent assaulting Mr. Siguenza realized that he would need to disconnect the seat belt to remove Mr. Siguenza from the seat.

53. When Mr. Siguenza and Ms. O'Keefe were out of the car, the agents told Ms. O'Keefe to "shut the fuck up."

54. One agent, believed to be the agent not wearing a baseball hat reflected in the image below ("Agent 4"), told Ms. O'Keefe and Mr. Siguenza they were under arrest for "impeding government operations."



55. On information and belief, the agents knew that none of the actions of either Ms. O'Keefe or Mr. Siguenza constituted an arrestable offense for obstruction or impeding government operations.

56. The agents lacked probable cause to believe Plaintiffs violated 18 U.S.C. § 111 because Plaintiffs did not forcibly assault, resist, oppose, impede, intimidate, or interfere with the actions of the ICE agents.

57. It is well-established that "the use of force is an essential element of the offense defined in 18 U.S.C. § 111." *U.S. v. Camp*, 541 F.2d 737, 739 (8th Cir. 1976). This element requires proof of "actual physical contact," or "such a threat or display of physical aggression toward the officer as to inspire fear of pain, bodily harm, or death." *U.S. v. Schrader*, 10 F3d 1345, 1358 (8th Cir. 1993).

58. No reasonable federal law enforcement officer could believe that Ms. O'Keefe or Mr. Siguenza following a vehicle at a safe distance and observing activities of federal agents in public locations constituted a crime under federal law.

59. Further, on information and belief, ICE agents assigned to Operation Metro Surge were specifically trained prior to January 11, 2026 that blowing whistles, observing and recording ICE agents, or cursing at them, are not considered forcible obstruction under the law and are not grounds to detain protestors or institute an arrest.

60. Further, upon information and belief, federal agents received training that they have limited arrest authority. For over two decades, ICE agents have been instructed that they can only make arrests for federal non-immigration offenses committed in their

presence if there is a likelihood the person will escape before an arrest warrant can be obtained. ICE agents cannot make arrests for violations of state laws or local ordinances, or for offenses not committed in an officer's presence.[3]

61. Upon information and belief, ICE agents also may not make arrests for obstruction unless the local U.S. Attorney's Office is willing to prosecute such actions.

62. Upon information and belief, a group of agents in the field will have an assigned supervisor or an agent in charge with responsibility to ensure other agents comply with the law and their duties. The supervisor or agent in charge of the agents described in this Complaint was negligent in allowing officers to threaten civilians, arrest United States citizens and permanent residents without legal justification, racially profile minorities in Minnesota, and use excessive force.

63. Other observers recorded the ICE agents assaulting and battering Ms. O'Keefe and Mr. Siguenza.

64. Agent 4 shouted at observers not to come near them despite the observers being quite far away.

65. Ms. O'Keefe was handcuffed by agents and placed in the back of a SUV. She was not put in a seatbelt, in violation of ICE policies and training. Agent Lagunas, Agent

---

[3] Michael J. Garcia, U.S. Immigration and Customs Enforcement, *Memo: Superceding* [sic] *Guidance re. Implementation of General Arrest Authority* (November 26, 2003), https://www.ice.gov/doclib/foia/policy/memoGuidanceRegardImpGeneralArrestAuthority_11.26.2003.pdf; *see also* Daniel Ragsdale, U.S. Immigration and Customs Enforcement, *Memo: Delegation of General Arrest Authority Under Title 19*, (April 4, 2016), https://www.ice.gov/doclib/foia/policy/delGeneralArrestAuthority_04.04.2016.pdf

Ravencamp, and a third agent were in the same vehicle as Ms. O'Keefe. Agent Ravencamp was in the passenger seat, while Agent Lagunas was driving.

66. Ms. O'Keefe's phone remained in her own car.

67. Mr. Siguenza was also handcuffed by agents and placed in a different car without a seatbelt, in violation of ICE policies and training.

68. When the immigration vehicle started driving away, the agents taunted Ms. O'Keefe.

69. Agent Ravencamp took Ms. O'Keefe's photo with his cellphone. After he took the photo, he showed the photo to Agent Lagunas who looked at the photo and said, "Damn, you don't have a good side, do you?"

70. Agent Lagunas told Ms. O'Keefe: "You guys have to stop obstructing us. That's why that lesbian bitch is dead." This was an obvious reference to the recent killing of Renee Nicole Good by an ICE agent and a threat that the agents would also kill Ms. O'Keefe.

71. Agent Lagunas then looked at Ms. O'Keefe in the rear-view mirror and said that she was "actually kind of cute." Ms. O'Keefe found it humiliating and terrifying to have the agents in the car make sexist and demeaning comments about her appearance while she was alone, handcuffed, and unable to escape, particularly given that they had demonstrated no care for her safety or wellbeing.

72. Ms. O'Keefe and Mr. Siguenza were transported to the Whipple Federal Building in Fort Snelling, Minnesota.

73. Ms. O'Keefe and Mr. Siguenza had their handcuffs removed and were put in ankle shackles. They were then moved to cells for US citizens, separated by gender.

74. Ms. O'Keefe was put into a cell with one other person. On her way to the cell, she observed a holding cell that was overcrowded, holding 40-50 people who did not have enough room to sit down. These were mostly Hispanic detainees. Ms. O'Keefe observed that three women were being held in a bathroom because there was not enough space in the holding cells.

75. Mr. Siguenza saw dozens of Hispanic people being processed in an unheated garage.

76. Ms. O'Keefe was held at the Whipple Federal Building for 8 hours.

77. At some point, two female agents questioned Ms. O'Keefe. One was named Gonzalez. The agents read O'Keefe her *Miranda* rights.

78. While imprisoned, Ms. O'Keefe asked at least four times to make a phone call but was never allowed to do so.

79. Ms. O'Keefe was brought to a small cell where she was questioned by a Homeland Security Investigations ("HSI") agent. The HSI agent asked Ms. O'Keefe to name organizations that were organizing Anti-ICE protests and asked her if she thought any "were capable of violence." Ms. O'Keefe said that the organizations could easily be found on social media, and that the community is not the one that is committing the acts of violence.

80. Mr. Siguenza was eventually allowed to call his wife, but first he was questioned by two agents named William and Garcia.

81. In the holding cell, Mr. Siguenza noticed several individuals believed to be United States citizens or permanent residents with injuries that were not being treated.

82. Mr. Siguenza was again brought to an interrogation where three men from HSI insinuated they could help him. The HSI agents suggested that they could help Mr. Siguenza's family members "get into the country with the right papers" if he would give them the names of protest organizers or other undocumented people. Mr. Siguenza declined their offer.

83. Eventually, two HSI agents came to Ms. O'Keefe and let her out of the holding cell. Ms. O'Keefe asked if she was going to be charged with anything, and they told her that they "really didn't know." The HSI agents added that they did not think she would be charged if she had not already been charged.

84. As Ms. O'Keefe was leaving, she told agents at the front gate what one of the agents had said about Renee Nicole Good. The agents told Ms. O'Keefe they would "elevate" the issue.

85. After she left the Whipple Federal Building, Ms. O'Keefe crossed the street to where a crowd was gathered protesting against Operation Metro Surge. She explained what had happened to her.

86. Mr. Siguenza was also released to the street about fifteen minutes after Ms. O'Keefe. About five minutes after he was released, agents started attacking protestors as reflected in the following image:



87. Federal agents started throwing flashbangs and shooting pepper balls at the protestors.

88. Someone on a bullhorn yelled for people to stay on the far side of the street, away from the Whipple Federal Building. Ms. O'Keefe was standing on a public sidewalk across the street from the Whipple Federal Building, but was struck in the ankle by a pepper ball fired by federal agents. Mr. Siguenza was also hit by a projectile despite also being far away from the protesters and the federal agents.

89. Ms. O'Keefe has continued to be tormented by the actions of the federal government and harm they caused to her and her property. She is suffering from anxiety and seeing a therapist for Post-Traumatic Stress Disorder.

90. Her distress has manifested itself in panic attacks and paranoia, anxiety, and depression. She found herself sleeping more than normal and losing weight. Her doctor gave her medication for panic attacks and nightmares and increased medication to help with anxiety. Ms. O'Keefe found herself fearful of agents coming to her home, and of

having her personal information released online. She was afraid to drive her car and scaled back her work. She stayed at home more than before her encounter with federal agents. And, most importantly, she stopped doing legal observations of ICE.

91. Mr. Siguenza has also suffered severe emotional distress. He was afraid to leave his house and took time off of work. Upon returning to work, he received an email that ICE was trailing a school bus that was coming to his school. He suffered a panic attack and had to leave work early. His stress and anxiety has manifested itself in weight gain, nightmares and depression. He began to see a therapist.

92. Mr. Siguenza has had to take unpaid leave from work as a result of these events, and has lost wages that he would have otherwise earned but for the actions of the United States.

## CLAIMS FOR RELIEF

### First Claim for Relief
### Federal Tort Claims Act – Assault

93. All of the foregoing paragraphs are hereby incorporated herein by reference and re-alleged as though fully set forth.

94. Under the FTCA, the United States is liable for the tortious acts of its agents, employees and officers.

95. As reflected by the actions alleged in this Complaint, federal agents acted with the intent to cause Ms. O'Keefe and Mr. Siguenza to experience fear or apprehension of imminent harm or offensive contact to Ms. O'Keefe and Mr. Siguenza while they were lawfully observing the agents.

96. At the time of these actions, the federal agents had the apparent ability to cause the harm and offensive contact to Ms. O'Keefe and Mr. Siguenza.

97. Ms. O'Keefe and Mr. Siguenza had a reasonable apprehension or fear that imminent harm and offensive contact would occur without significant delay.

98. By engaging in the unlawful and unprivileged acts described in this Complaint, the federal officers, officials, and employees, at the direction of the United States, directly and proximately caused Ms. O'Keefe and Mr. Siguenza to suffer mental and physical injuries.

99. The actions of the federal agents constitute the intentional tort of assault under Minnesota law, for which Defendant is liable for damages.

**Second Claim for Relief**
**Federal Tort Claims Act – Battery**

100. All of the foregoing paragraphs are hereby incorporated herein by reference and re-alleged as though fully set forth.

101. Under the FTCA, the United States is liable for the tortious acts of its agents, employees, and officers.

102. As reflected by the actions alleged in this Complaint, the federal agents intentionally caused harmful or offensive contact with Ms. O'Keefe and Mr. Siguenza and items worn, held by, and closely connected to Ms. O'Keefe and Mr. Siguenza, including but not limited to spraying chemical irritants which entered the vehicle vents and passenger compartments, breaking vehicle window glass which struck and fell on Ms. O'Keefe and

Mr. Siguenza, physically pulling Plaintiffs from the vehicle, handcuffing them, and later striking them with projectiles.

103. By engaging in the unlawful and unprivileged acts described in this Complaint, the federal officers, officials, and employees, at the direction of Defendant, directly and proximately caused Ms. O'Keefe and Mr. Siguenza to suffer mental and physical injuries.

104. The actions of the federal agents were in violation of the United States Constitution; in violation of binding federal statutes, regulations or official policies; or otherwise, do not constitute the exercise of performance of discretionary functions or duties.

105. The actions of the federal agents constitute the intentional tort of battery under Minnesota law, for which Defendant is liable for damages.

**Third Claim for Relief**
**Federal Tort Claims Act – False Arrest/False Imprisonment**

106. All of the foregoing paragraphs are hereby incorporated herein by reference and re-alleged as though fully set forth.

107. Under the FTCA, the United States is liable for the tortious acts of its agents, employees, and officers.

108. As reflected by the actions alleged in this Complaint, the federal agents intentionally restricted the physical liberty of Ms. O'Keefe and Mr. Siguenza by words and act, including but not limited to boxing in their vehicle, physically detaining and

handcuffing them, and transporting Ms. O'Keefe and Mr. Siguenza to the Whipple Federal Building and imprisoning them within it against their will.

109. Ms. O'Keefe and Mr. Siguenza were aware of the words and acts of the federal agents, and were harmed by them.

110. The federal agents used physical barriers including but not limited to hand cuffs, car doors and holding cells, physical force, and the threat of the use of immediate physical force to intentionally restrict the physical liberty of Ms. O'Keefe and Mr. Siguenza. At all relevant times, Ms. O'Keefe and Mr. Siguenza believed that the federal agents had the ability (though not the lawful authority) to carry out their threats of physical force.

111. The agents who arrested Ms. O'Keefe and Mr. Siguenza violated and exceeded any legal authority they had to make arrests for violations of federal laws.

112. The agents, officers, and employees of the United States violated and exceeded any legal authority they had to imprison Ms. O'Keefe and Mr. Siguenza for hours in their vehicle and at the Whipple Federal Building.

113. The restriction on Ms. O'Keefe and Mr. Siguenza's physical liberty was complete, with no reasonable means of escape known to them once the restriction began.

114. By engaging in the unlawful and unprivileged acts described in this Complaint, the federal officers, officials, and employees, at the direction of Defendant, directly and proximately caused Ms. O'Keefe and Mr. Siguenza to suffer mental and physical injuries.

115. The actions of the federal agents were in violation of the United States Constitution; in violation of binding federal statutes, regulations or official policies; or otherwise, do not constitute the exercise of performance of discretionary functions or duties.

116. The actions of the federal agents constitute the intentional tort of false imprisonment and false arrest under Minnesota law, for which Defendant is liable for damages.

**Fourth Claim for Relief**
**Federal Tort Claims Act – Negligence**

117. All of the foregoing paragraphs are hereby incorporated herein by reference and re-alleged as though fully set forth.

118. Under the FTCA, the United States is liable for the tortious acts of its agents, employees, and officers.

119. The United States has duty of care for training, supervision, and a general duty of care. The agents, officers, and employees of the Defendant had a legal duty of care to Ms. O'Keefe and Mr. Siguenza to, among other things, follow the federal laws faithfully, provide safe and sufficient detention conditions to Ms. O'Keefe and Mr. Siguenza while in captivity, ensure their welfare, and utilize the same care that a reasonable person would use in the same or similar circumstances.

120. An agent in charge or supervisory agent was responsible for the supervision of the group of agents who violated Ms. O'Keefe and Mr. Siguenza's legal rights, and failed to satisfy that responsibility by negligently supervising the team of arresting agents.

121. By engaging in the unlawful and unprivileged acts described in this Complaint, including but not limited to committing assault and battery against Ms. O'Keefe and Mr. Siguenza, arresting and holding Ms. O'Keefe and Mr. Siguenza without legal authority, and failing to provide for appropriate detention conditions for Ms. O'Keefe and Mr. Siguenza while falsely imprisoned, the federal officers, officials, and employees, at the direction of Defendant, directly and proximately caused Ms. O'Keefe and Mr. Siguenza to suffer mental and physical injuries.

122. The actions of the federal agents were in violation of the United States Constitution; in violation of binding federal statutes, regulations or official policies; or otherwise, do not constitute the exercise or performance of discretionary functions or duties.

123. The action of the United States constitutes negligence under Minnesota law, for which Defendant is liable for damages.

**Fifth Claim for Relief**
**Federal Tort Claims Act – Intentional Infliction of Emotional Distress**

124. All of the foregoing paragraphs are hereby incorporated herein by reference and re-alleged as though fully set forth.

125. Under the FTCA, the United States is liable for the tortious acts of its agents, employees, and officers.

126. As reflected by the actions alleged in this Complaint, federal agents engaged in conduct against Ms. O'Keefe and Mr. Siguenza which was so extreme and outrageous

that it passed the boundaries of decency and is utterly intolerable to the civilized community.

127. The federal agents' conduct was intentional or reckless.

128. The federal agents' conduct caused emotional distress to Ms. O'Keefe and Mr. Siguenza.

129. The emotional distress suffered by Ms. O'Keefe and Mr. Siguenza was so severe that no reasonable person could be expected to endure it.

130. By engaging in the unlawful and unprivileged acts described in this Complaint, the federal officers, officials, and employees, at the direction of Defendant, directly and proximately caused Ms. O'Keefe and Mr. Siguenza to suffer mental and physical injuries.

131. The actions of the federal agents were in violation of the United States Constitution; in violation of binding federal statutes, regulations or official policies; or otherwise, do not constitute the exercise of performance of discretionary functions or duties.

132. The action of the United States constitutes intentional infliction of emotional distress under Minnesota law, for which Defendant is liable for damages.

**Sixth Claim for Relief**
**Federal Tort Claims Act – Trespass to Chattel**

133. All of the foregoing paragraphs are hereby incorporated herein by reference and re-alleged as though fully set forth.

134. Under the FTCA, the United States is liable for the tortious acts of its agents, employees, and officers.

135. As reflected by the actions alleged in this Complaint, federal agents caused intentional damage to Ms. O'Keefe's personal property, including but not limited to spraying chemical irritants into the ventilation system of her car, and breaking the windows of her car.

136. By engaging in the unlawful and unprivileged acts described in this Complaint, the federal officers, officials, and employees, at the direction of Defendant, directly and proximately caused damage to, and intentionally interfered with, Ms. O'Keefe's personal property.

137. The actions of the United States constitute trespass to chattel under Minnesota law, for which Defendant is liable for damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request judgment as follows:

A. Finding, adjudging, and declaring the United States has engaged in the violations of law alleged herein;

B. Awarding to each Plaintiff compensatory damages of $750,000;

C. Awarding Plaintiffs their costs and disbursements; and

D. Awarding any and all other additional relief as permitted by law and found by this court to be justified and appropriate.

Dated: September 28, 2026

*<u>/s/ Ian Bratlie</u>*
Ian Bratlie (0319454)
Bratlie Law Office
931 Madison Ave
Suite 206
Mankato, MN 56001
(918) 805-0654
ianbratlie@bratlielawoffice.com

*<u>/s/ John A. Kvinge</u>*
John A. Kvinge (0392303)
Inga K. Kingland (0395801)
Larkin Hoffman Daly & Lindgren Ltd.
8300 Norman Center Drive, Suite 1000
Minneapolis, Minnesota 55437-1060
(952) 835-3800
jkvinge@larkinhoffman.com
ikingland@larkinhoffman.com

*Attorneys for Plaintiffs Patricia O'Keefe and Brandon Siguenza*